The next case is Cederberg v. Legacy Health, Case 20-35907, and we'll let counsel get situated. So, Counsel for Cederberg will be starting us off today. What we're going to do, because you're splitting time, is we're going to give you separate clocks so that the person going second isn't over there sweating, thinking you're using up all their time. So, go ahead and let us know how much time you hope to reserve the person that's starting, and then you'll have your own clock. It'll be eight minutes for Mr. Park and seven minutes for Mr. Cox. Mr. Park, you're starting us off. May it please the Court, David Park and my co-counsel Michael Cox represent the plaintiffs Nicholas Cederberg and Haley Shelton in this lawsuit. I'm going to be addressing the question that the panel asked of the parties, along with addressing the district court's errors on the issues of probable cause and good faith on the immunity defense. I'd like to reserve two minutes for rebuttal, if I could. So, Counsel, what is your colleague going to do? Mr. Cox will address the district court's error on the immunity statute's applicability to the policy and training claim, as well as address any questions the court may have regarding the certification question or the alternative grounds for affirmance, if the court goes there. Regarding the question posed by the court, Mr. Tilka's murder-suicide spree that injured Plaintiff Cederberg was the foreseeable consequence of the defendant's failure to treat Mr. Tilka's mental illness. Is that because of his failure to hold him in the hospital? Correct. All right, that's the act or omission which you claim has negligently caused the damages, correct? That's correct. And our expert evidence that we submitted in the record says that had Mr. Tilka been held on a physician's hold, he would have received treatment. As a result of not being held, he received no treatment. The reason I ask that question is because in the district court, you characterize this failure as a failure to train nurse practitioner Hammond to be able to recognize when a hold was necessary. And now you're taking the position, and I think you're right, that the act or omission is a failure to hold. So go ahead. Under either theory, so we have Ms. Hammond's direct negligence for failure to meet the standard of care in conducting an assessment, and then separately we have the hospital's direct negligence in failing to adopt a policy that requires assessment of domestic violence perpetrators and failure to train staff how to assess domestic violence perpetrators. And our expert testimony in this case indicates that more likely than not, had she been properly trained and had she followed standard of care, medical standard of care in conducting her assessment, she would have held Mr. Tilka rather than released him, and as a result of that hold, treatment would have been initiated. It seems to me, counsel, that this is where the focus sort of comes in, that there's a fair amount of either speculation or intervening causes or both between these events relating to the hospital and its lack of treating Mr. Tilka and the ultimate horrible thing that happened to your clients. And I'm just concerned that it's too attenuated to permit liability, regardless of what the statute means, which is a whole other issue. Well, if the court looks at mental illness like a disease that has gone untreated, then the passage of time does not detract from the inference that the failure to treat... Well, it can. Many physical symptoms go away. I mean, if you don't treat a, you know, bulging disc, it's probably better in six months if you just rest up. So it isn't true that the absence of treatment equals unchanging characteristics, nor is it true that treatment always works. Well, we have a pattern of behavior or events that illustrate a worsening mental health condition over time that predate the admission to the hospital. Well, counsel, so I think we understand it. To sort of build on Judge Graber's analogy, if you have a bulging disc, that's probably not going to go away. But if you also got in a car accident between, you know, when you were diagnosed with a bulging disc and now you say you've got a spot, obviously you have to wonder how much of a role the car accident played as sort of an intervening cause. And that's the difficulty here. What did your experts say about, for instance, there was some sort of physical altercation with his other ex-wife's partner, I think? A shoving match at a door. Yeah, and that was pretty close in time. That was the same day that he went on and did these other horrible things. Either the same day or the day before. It just seems like, generally speaking, you think that's some sort of triggering event that happened, some sort of independent triggering event. But what did your experts say about that? That it is simply part of the pattern of worsening mental illness predating. So if the court looks at what's in the record, within a year prior to the November 29 and November 30 hospital admissions, he had a bankruptcy. He lost a job. He had a DUI. He had an outstanding warrant for his arrest for DWS, all significant events. On the 29th, he both threatened his wife via text and verbally to the point that she called the police. The police were looking for him, but did not seize and arrest him. That's in the record. And on that night, through his verbal manipulations, he gets his wife over to the house based on, I'm going to kill myself if you don't come, and she takes him into the hospital. That's the 29th. On the 30th, he purchases two knives, which he intends to use to slit the throats of his wife and his child, and then kill himself. And he manipulates again his wife to come over, and in her presence, he administers a potentially lethal injection of insulin. And the wife then calls 911, and she's in hysterics. She doesn't take him to the hospital that night. Counsel, you know, I think we've all read the briefing. We're very familiar with this horrible thing. The issue we're having, or the issue that at least I'm having, the question I've got is, even assuming, right, that the nurse had some sort of failure to not do something here, it's all the stuff that happened at the 24 days between. So, you know, and if we just stipulate it for the sake of argument that something different should have been done, how do we know that there's a proper causal link between what she did? Well, A, because our expert witness says so. More likely than not, treatment would have made a difference. And B, because the pattern I was just illustrating continues. These events that occur after are the same type of indicia or symptoms of mental illness that predated his admissions. Well, some of them are not. He lost his job, for example. Well, he had lost his job before. And there's a disputed issue of fact on this record, whether he had lost his job or he was simply saying that to manipulate people, because the records in evidence from Comcast, the employer, demonstrate that the reason for loss of job is death. He was not terminated prior, according to the employer records. So, Counsel, we've used up your eight minutes, and it's part of the thing that happens when you spend argument time. But do either of my colleagues have any more questions? We'll give you another minute on the tail end. Okay. On the back end? Yeah, on the back end. Okay. Thank you, Your Honor. Thank you, Counsel. So, Counsel, I believe I'm just going to ask you a question, and I think it's actually a question that may be in his subject, but hopefully you're fair and we can maybe address it on rebuttal if he does a bad job. And the probable cause issue, I'm really struggling with how that works here, because it seems to me that the statute was written with the idea that you would have probable cause, you need to have probable cause to commit somebody or to take an action. I don't really know what is probable cause to not take an action. So we don't ever, you know, in law school we didn't learn about did the law, did the officer have probable cause not to search a person, right? Like, you know, in theory the officer doesn't, you know, stop somebody, ask them some questions, and then doesn't search them, and then some terrible thing happens, and you say, did the officer have probable cause to not search? So it just doesn't seem like the whole concept of probable cause is a very good fit. Now, I understand the Oregon courts have said this applies to a circumstance like this, where it's a failure to take an act, not just taking an act. But how does probable cause work there? And specifically, does probable cause not to do something start right when probable cause to do something ends, or is there some, I mean, my instinct is there's some sort of overlap. There's an area where, in theory, you would have probable cause to go either way, right? No, we've struggled with that very same issue in writing the briefs. We've talked about it a number of times. So it's easy to discuss probable cause in creating a hold. It's hard to discuss probable cause in the decision to release. And so we did the best we could to apply that term to a release decision, which we have here. And I'm not sure. And here's why. Let me say this. So it's kind of well understood, black-letter law, that the police officer can't say, well, I found a gun, therefore I obviously had probable cause to search the person, right? You can't use after-the-fact findings to support your probable cause. Right. But when you're talking about something like this where you didn't take an action and something horrible happens, it's hard to get away from the feeling that that's exactly what's always happening, is that you're basically saying, well, of course you had probable cause to, or I guess you didn't have probable cause to not commit the person because look at these bad things that happened. But that doesn't seem correct that you would use what actually happened. That's correct. And I agree. I think we all agree that you can't use hindsight with the actual events of December 25th for the probable cause determination on December 1st or November 30th. You have to look at the facts that were there on November 30th. And then the question is, did N.P. Hammond have probable cause to make a determination that Tilka was not a danger to himself or the community? Mr. Cox, may I ask you, is that probable cause a legal question to be determined by the judge or is it somewhat of a factual question to be submitted to a jury? This is actually going to be a better question for Mr. Park because that was his area. But there's this overlap as to what a judge can do versus when it becomes a factual issue that we tried to break out and brief. And it's the same with good faith and it's the same with causation. What's the judge's role in saying there's not enough for causation? What's the judge's role in saying there is probable cause? I'm familiar with finding that the judge has probable cause to issue a warrant. That's a legal issue, right? Right. How is this different? It's not. So the initial decision on probable cause is there is a role for the judge to play in making a legal decision. And probable cause in this case is an affirmative defense, which N.P. Hammond has, right? Right. So if the judge finds that there is probable cause for Hammond to have let the person go by because the person was cooperative and helpful, isn't that sufficient to invoke the immunity? It could be, but it's really factual, dependent on the record and the facts. But the judge has to make up his mind on whether there is probable cause, not convicting cause, not beyond a reasonable doubt, not bounds of probabilities, but probable cause. So what was wrong with the application of immunity here? Well, we're going to allow Mr. Park, I'm going to allow Mr. Park to address the probable cause issue because he's the one that prepared for it. Then could I ask you, if I may, Judge, may I ask a different question about the application of the statute altogether? In my mind, it's questionable whether the immunity statute even applies here, and maybe you're, again, not the right person to address this, but there are provisions specific to immunity for damages resulting from the misconduct of a person with mental illness, but they're quite limited. You know, for example, if they're on outpatient commitment and the person at the hospital acts with willful and wanton neglect of duty, which is a pretty high standard. So the design of the statute, it seems to me, the main part of it is you can't be liable to the mentally ill person who really resents having been committed, but there's a quite limited immunity for damage to third parties. And I'm not sure that's how the Oregon courts would read that, but if there's a doubt about that, shouldn't we certify a question? Yes, I agree. I think this is a question of first instance on the application of these immunity statutes to the claims we have in this case, and particularly the claim that we have for negligence policies and training, because when you go through the part of the case I'm arguing is the statutory interpretation part, when you look at the statutory interpretation under PGE versus BOLI, which has been our long-established framework for interpreting statutes in the state of Oregon, and Judge Graber's very familiar with that. I was there long ago when it was decided. Judge Graber's probably done more cases involving PGE versus BOLI than any attorney in the surrounding five miles, but under that statute you start with the language, and in the language of this case it's not, as the district court had said, a broad grant of immunity. It's a very specifically delineated grant of immunity. It's set forth in detail. It's not left to broad application, but the statute, the immunity statute, which is 426.335 subsection 5, specifically lists the five areas where there will be immunity, and none of those five instances cover the creation by a hospital of sufficient policies and the creation of a sufficient training program for dealing with these situations. So we still contend it was error by the district court to apply the immunity statutes to the claims for negligent policies and training. Thank you, Your Honors. Well, thank you. And I think what we'll do is we'll just have one person speak for rebuttal, so if you've got anything important you want to tell them, probably tell your colleague. Ms. Taylor? Good morning. May it please the Court, Hillary Taylor, Keating-Jones-Hughes, on behalf of the defendants. Would you bring the microphone down and speak a little louder, please? Yes, thank you. That's very helpful. Thank you. Some of us have older ears, and I'm just not as tall. May it please the Court again, Hillary Taylor, Keating-Jones-Hughes, on behalf of Defendant Appelese, Legacy Health, Legacy Meridian Park Hospital. This Court should affirm the rulings of the district court. I want to start this morning with addressing the Court's question about foreseeability, move on to causation, and then the immunity argument, the Court's time and questions permitting. With respect to foreseeability, while we don't agree that foreseeability defines the scope of the defendant's duty, if any, to the plaintiff, regardless, no reasonable person could find that Sederberg's being shot by Tilke 24 days after he was discharged from Legacy was a reasonably foreseeable consequence of Legacy's alleged negligence weeks prior, of Nurse Hammond's decision that he wasn't holdable and needed to be released. Tilke had no prior criminal history, no prior mental health or psychiatric treatment that was known. He didn't possess a gun. There were significant intervening factors between when he was discharged from Legacy on December 1st and his ultimate crimes on December 25th. There was no indication at that time to defendants that their conduct created a risk of harm to a member of the public, such as this police officer, occurring to potentially occur a month in the future. This conclusion that it's not a foreseeable harm is consistent with Oregon law on foreseeability and the cases that have been cited somewhat in the briefs, Piazza v. Kellam, Chapman v. Mayfield, and Buechler. Furthermore, just to reiterate, if foreseeability is indeed intended to be a limit on liability, it's concerning to me the idea that a medical defendant could be held liable for treatment to someone other than the plaintiff, meaning their patient, and then 24 days later that patient shoots people and kills someone. That would be a vast expansion of liability under Oregon negligence law. I'm not sure where the limit would be, and that would certainly be contrary to current Oregon law with respect to the limits on liability of foreseeability against medical defendants in general. Moving on to causation. The district court was correct. There's simply no causal link here. There was no causation between what the defendant's alleged negligence is and the harm. The parties agreed in our briefing what the standard is for causation. It's the but-for standard under Joshi. And you cannot say that the defendants had defendants held Tilka to a reasonable probability, medical probability, he would not have later shot Mr. Cederberg. You simply cannot say that. The evidence relied on by the plaintiffs for that proposition is speculative entirely. It's based on hypotheticals. What could have happened if something different had happened? We don't know and we can't say what would have happened if Tilka had been held, even if he'd been held for 12 hours or 2 days or 5 days. Counsel, you say we can't say that, but I think that's exactly what their experts said pretty much. So one of the difficulties is what role do experts play in something like this? Because, you know, I don't think we have to defer to an expert or the trial court didn't have to defer to an expert if they have a very speculative causal chain, but then they just say, and that's what happened. So what do you do with, what does a court do with expert testimony in a situation like this? As we argued below and as I argue now, the expert testimony in this realm is irrelevant to the question. It couldn't actually supply the answer that was necessary, which is a legal causal link between the negligence and the harm. So the expert testimony in this instance does not get the court there and can't. The intervening acts that occurred is what actually caused the harm, and there's nothing that an expert could say that can link those two things up, and nothing that they did say in our opinion. I suppose it's possible that an expert could say, you know, a mental health expert could say something like when a person shows A, B, and C symptoms, 96% of people that show those symptoms, you know, commit suicide or something. I mean, I'm just making something up here. But in that situation, the expert, you know, assuming that was all true, that would be powerful evidence that maybe a lay person wouldn't know maybe. This obviously seems to be of a different sort because of all the time and all the intervening events, but there could be a role for experts, I think, in the former example I gave, the one where it's still direct. Perhaps, Your Honor, and I do think, though, however, we would find that evidence potentially objectionable at the trial court level and would argue that an expert brought in to argue simply about statistics would not reach the medical probability standard that we have in a case like this. But it is possible that in some other case it could have a role. The point we're making here and what I think the district court correctly decided is it doesn't, and it can't get the plaintiffs to where they need to go in this case. There are too many intervening acts, the passage of time, all the things that happen between the alleged negligence and the harm. What's your response about the loss of the job question? Yeah, Your Honor. The timing of that counsel disputes Mr. Tilke's self-description? My understanding from the record is that the last time he worked at Comcast, which is borne out in that record or in that document, was the 16th. Based on the text messages that are in the record, I believe his former wife understood that he had lost his job. There's also a communication or an interview with his mother that she had understood that he had lost his job. It appears to me that there is actually no evidence that I'm aware of in the record that he didn't lose his job. And he lost his job. I think the last day he worked was the 16th is my memory. So that was, you know, almost 10 days before criminal conduct, but was definitely over two weeks from when he had been discharged from my client's hospital. That's a significant event. He was employed at the time he was evaluated by Nurse Hammond, and I believe the record reflects that he liked his job at Comcast. Certainly he hadn't lost his job at that point. Well, I don't have that in front of me, but if the records from Comcast state that his job ended because of his death, I suppose there's an inference that he just was AWOL or on vacation or something starting on the 16th. Does that make a difference? I don't think it does, Your Honor. And part of that is because there's the additional sort of affirmative evidence from his wife, as well as his mother, confirming that they understood that he had lost his job. May I take you to the immunity point? Yes, Your Honor, please. All right, I have two questions. Okay. It sounds to me like the immunity statute is an affirmative defense for N.P. Hammond, correct? And there are two elements there, good faith and probable cause. I agree with that, Your Honor. I agree, yes. On the element of good faith, we have a nurse Hammond's testimony saying, I was in good faith. I'll shorten that up, right? But at her deposition, she testified that she did know that Tilke had bought knives and intended to kill the children and himself. And yet in the hospital record, she says the details of what he intended to do were sketchy. Is that evidence of a cover-up of her good faith? I don't think it's evidence of a cover-up, no, Your Honor. I think what that is is the nurse practitioner testifying as to all the information that she had that went into her evaluation. But it wasn't sketchy, was it, at the time? She wrote sketchy in the record. She knew that he had bought knives and intended to use them. Why didn't she say something more than sketchy? Does that create a tribal issue of fact as to her good faith, my question? I don't believe it does, Your Honor, because her good faith, I think the court's role in determining that and under the statute, her good faith is what she believed at the time, her subjective intent, provided there wasn't other information that she knew and disregarded. Counsel, I have a serious question about whether subsection 1 of the statute has any role to play in this situation. It appears to me that subsection 1 is intended to protect against liability on the part of your client towards the individual who is committed, because there's a protection only for the initiation of commitment procedures. And when you go on later in the statute, there are separate sections dealing with harm to third parties, not the committed individual. And those seem to be applicable in the situation where there's a third party, but none of them happens to apply in this situation. So why does this statute even have anything to do with it? Yeah, Your Honor. So obviously our position is different. I believe section 1 of 426.335 does apply to this situation, and specifically the section that what we rely on is subsection 5, which, you know, applies to, specifically states, licensed independent practitioners, hospitals, judges cannot be held civilly or criminally liable for acts pursuant to all of these other statutes that are listed. Right. But, again, it doesn't say — it seems to me that those actions, again, pertain to the relationship between the hospital and the individual who's being committed, and that there are, again, separate sections starting with section 8, I think, that deal with liability to third parties. At least it seems ambiguous, and if we end up reaching the statutory interpretation or scope question, shouldn't we be sending a question to the Oregon Supreme Court? I would say no. And I would say to answer your first question, I do think it applies in this instance. Well, I know you do. I think it's ambiguous. Right. And part of the reason for that is the Oregon Court of Appeals decision in Deming, which I think applies here and is an action to third party and I think would apply here. But, no, I don't think it's necessary to certify this question to the Oregon Supreme Court, and in part because even if the court were to somehow hold that defendants are not immune from liability or that the district court incorrectly applied this statute, you would still have to also address the causation question. And the causation question does not need to be certified to the Oregon Supreme Court, and nor has it been asked to be. Well, it doesn't matter. It's up to our discretion. Nobody has to ask. Right. But the causation question is dispositive, frankly, and the court has no need to go beyond that, simply could affirm on that basis of the district court's ruling and not get into the question about immunity if the court finds that. Counsel, can I ask you a question about that? No, I'm good. Thank you. A question about the causation standard, and we've talked about that some, but we haven't talked about the discharge instructions that I think were given here. And what role do those play in the sense of, and this would be a question for your colleagues, what role do the discharge instructions, because it seems to me, is a nurse entitled or a medical professional entitled to rely on the idea that, I'm not sure, but you're going to get some follow-up care on Monday with somebody, or should the medical professional maybe assume that the person won't do that? Well, that's a good question, Your Honor. And so we're looking at the context of this. So the nurse practitioner is doing a psychological assessment as this person was brought in from the emergency department, and her job is limited in such to that role. And then when she is consulting with the discharging physician, the physician who actually would discharge the patient, Dr. Nazemi, and that decision to do that. At that point, the decision that the hospital can make, there are several, one of which is can you hold the patient. If you can't hold the patient because they don't meet criteria and they're not voluntarily going to stay, then you can't keep the patient, obviously. So in discharging, the question becomes, okay, what did she do? She gave him, and he was amenable to this and cooperative according to the records. He was interested in outpatient mental health treatment. He was interested in medication. And so she worked and helped him to be able to facilitate that. And then actually there's evidence in the record that after he had been discharged, I believe she made follow-up phone calls. And so in part, I think the provider does have an obligation to act according to their standard of care and to also do as she did, which was discharge the patient with a plan for follow-up and for his next steps. And that's what she did. Now, can she, the nurse practitioner at the hospital, make him do anything? Certainly not. She can't ensure that he gets follow-up care, just as in any other situation. If it's mental health or bulging disc, as the court talked about earlier, you can't require that your patient do something because the patient has to do that on their own, obviously. And I see that my time appears to be up. Thank you, counsel. Do we have any other questions? Thank you. Seeing none, we'll go ahead and allow you to have your rebuttal time. The question I've got, did your experts talk at all about what they said would have happened if the patient here had followed up with the, if he had gone to his. On the follow-up. Yes, both Dr. O'Malia and Dr. Mohandasi talked specifically about what would happen had a hold been issued in the way of treatment. A hold had been issued, but what about if he had, if no hold had been issued but he had actually gone to his appointments that had been set up for him afterwards? So that would be. They did not address what would have happened had he kept his appointments. But couldn't the nurse in this instance sort of think that he would do what he said he was going to do, which was go to those appointments? So going back to that point, Your Honor, that is addressed in the sense that both Dr. Mohandasi and Dr. O'Malia identified the fact that Nurse Hammond did not follow the standard of care in conducting her assessment or in the process that she followed in releasing him from the hospital. It was inadequate follow-up. She didn't ensure that there was a proper follow-up program. So that's part of the lack of probable cause and the lack of good faith that are issues in the case. And you can think of in this case Nurse Hammond turning a blind eye on the sketchy issue. You know, she writes sketchy in her report. And our expert witnesses say that not only was that dishonest in the sense that she was turning a blind eye to something that standard of care told her she should follow up on, but similarly with regard to her notation of paranoia in the context of domestic violence, she did not follow up or explore what paranoia was. Similarly, in regard to the possible diagnosis of bipolar disorder, she did not explore that or how it impacted the context in which Mr. Tilke was being presented to her in the hospital. So you can't have good faith if you turn a blind eye to facts that tell you you need to ask more questions. And we have that evidence in the case, and that creates an issue of fact on good faith. To get to Judge Baya's question on probable cause, there's a disputed fact question on the underlying facts of probable cause here because Nurse Hammond didn't follow the standard of care. She actually did not assess homicidality of Mr. Tilke at all. And that's a requirement that she must do to make a hold or release decision. She must assess danger to self and others. She has to present evidence to the judge sufficient to allow him to find that she had probable cause to let her go. Correct. Right. And that evidence is disputed based upon the evidence of how she conducted her assessment. But if it's disputed to the judge and it's a judge's call, isn't it an abuse of discretion standard that we apply? No, it's not. In a probable cause, if facts are disputed, the jury decides the facts, and then the court instructs the jury on what facts constitute probable cause. And there's a decision that we cite, Nash v. Lewis, and that is very similar in this regard. And in Nash v. Lewis, the lack of probable cause question was whether or not Dr. Harris, in that case, had actually assessed the dangerousness of Mr. Nash before making the decision to commit him. And because that issue was disputed, very similar to the dispute we have here, the court found there was a triable issue on probable cause in Nash v. Lewis. It's the same scenario here. All right, counsel. I think we've gone about four minutes over by my calculation. Sorry. No, it's fine. It's been very helpful. But if my colleagues don't have any further questions, I think we have your argument. All right. Thank you very much. Thank you to both sides. And this case, we'll take it under advisement, which leaves us with one more case, which is Green v. United States of America, case 21-35228. And we'll let counsel get situated for that. Thank you.
judges: GRABER, BEA, VANDYKE